## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNIVERSAL SECURE REGISTRY, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 17-585-CFC-SRF |
| ) | |
| APPLE INC., VISA INC., and VISA ) | |
| U.S.A., INC., ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

Presently before the court in this patent infringement action are the following motions:
(1) a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to
Federal Rule of Civil Procedure 12(b)(6), filed by defendants Apple Inc., Visa Inc., and Visa
U.S.A., Inc. (collectively "defendants") (D.I. 16); and (2) defendants' motion to transfer venue to
the Northern District of California pursuant to 28 U.S.C. § 1404 (D.I. 21). For the following
reasons, I recommend that the court deny defendants' motions to dismiss and transfer.

## II. BACKGROUND

### A. Parties

Plaintiff Universal Secure Registry, LLC ("USR") is a limited liability company
organized and existing under the laws of Massachusetts with its principal place of business in
Newton, Massachusetts. (D.I. 1 at ¶ 4) USR develops technological solutions for identity
authentication, computer security, and digital and mobile payment security which allow users to
securely authenticate their identity using technology built into a personal electronic device
combined with the users' biometric information. (*Id.* at ¶ 21) USR is the owner by assignment

of United States Patent Nos. 8,577,813 ("the '813 patent"); 8,856,539 ("the '539 patent");

9,100,826 ("the '826 patent"); and 9,530,137 ("the '137 patent") (collectively, the "patents-in-

suit"). (*Id.* at ¶¶ 2-3) The patents-in-suit allow a user to employ an electronic device as an

"electronic wallet" capable of interacting with point-of-sale devices to authorize payments. (*Id.*

at ¶ 22)

Apple Inc. ("Apple") is incorporated in California and maintains its headquarters in

Cupertino in the Northern District of California. (*Id.* at ¶ 5) Apple maintains a retail store in

Delaware. (*Id.* at ¶ 13) Visa Inc. and Visa U.S.A., Inc. ("Visa") are Delaware corporations

maintaining a principal place of business in Foster City, California. (*Id.* at ¶¶ 6-7) USR accuses

defendants of infringing the patents-in-suit by providing the Apple Pay service. (*Id.* at ¶¶ 8-9)

Specifically, USR identifies the following allegedly infringing devices which support Apple Pay:

> Apple iPhone 7, iPhone 7 Plus, iPhone 6s, iPhone 6s Plus, iPhone 6, iPhone 6
> Plus, iPhone SE, iPhone 5, 5s, and 5c (paired with Apple Watch), iPad (5th
> generation), iPad Pro (12.9 inch), iPad Pro (9.7 inch), iPad Air 2, iPad mini 4,
> iPad mini 3, Apple Watch Series 2, Apple Watch Series 1, Apple Watch (1st
> generation), MacBook Pro with Touch ID, and all Mac models introduced in 2012
> or later (with an Apple Pay-enabled iPhone or Apple Watch) (collectively, the
> "Accused Products") . . . .

(*Id.* at ¶ 39)

**B. Patents-In-Suit**

USR filed this patent infringement action on May 21, 2017, asserting claims for

infringement regarding the patents-in-suit. (D.I. 1 at ¶ 2) The '813 and '539 patents are both

entitled "Universal Secure Registry" and list Dr. Kenneth P. Weiss as the sole inventor. (*Id.* at

¶¶ 25-26) The '813 patent issued on November 5, 2013, and the '539 patent was granted on

October 7, 2014. (*Id.*) The '826 and '137 patents are both entitled "Method and Apparatus for

Secure Access Payment and Identification," and list Dr. Weiss as the sole inventor. (*Id.* at ¶¶ 27-

2

28) The '826 patent issued on August 14, 2015, and the '137 patent issued on December 27, 2016. (*Id.*)

## C. Procedural History

In 2010, USR sent Apple multiple letters describing its patented technology and seeking to partner with Apple to jointly develop a payment method involving a software-modified payment phone and the use of biometric identity authentication. (D.I. 1 at ¶ 33) USR also pursued a partnership with Visa during this time, engaging in a series of confidential discussions with senior Visa representatives which included detailed presentations of the patented technology under the protection of a non-disclosure agreement. (*Id.* at ¶ 34) Instead of partnering with USR, Apple and Visa ultimately partnered with each other and other payment networks and banks as early as January 2013 to allegedly incorporate the patented technology into the Apple Pay service. (*Id.* at ¶ 35) Apple publicly launched Apple Pay on September 9, 2014. (*Id.* at ¶ 36)

## III. DISCUSSION

### A. Venue

#### 1. Legal standard

Section 1404(a) of Title 28 of the United States Code grants district courts the authority to transfer venue "[f]or the convenience of parties and witnesses, in the interests of justice . . . to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Much has been written about the legal standard for motions to transfer under 28 U.S.C. § 1404(a). *See, e.g.*, *In re Link_A_Media Devices Corp.*, 662 F.3d 1221 (Fed. Cir. 2011); *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995); *Helicos Biosciences Corp. v. Illumina, Inc.*, 858 F. Supp. 2d 367 (D. Del. 2012).

3

Referring specifically to the analytical framework described in *Helicos*, the court starts

with the premise that a defendant's state of incorporation has always been "a predictable,

legitimate venue for bringing suit" and that "a plaintiff, as the injured party, generally ha[s] been

'accorded [the] privilege of bringing an action where he chooses.'" 858 F. Supp. 2d at 371

(quoting *Norwood v. Kirkpatrick*, 349 U.S. 29, 31 (1955)). Indeed, the Third Circuit in *Jumara*

reminds the reader that "[t]he burden of establishing the need for transfer . . . rests with the

movant" and that, "in ruling on defendants' motion, the plaintiff's choice of venue should not be

lightly disturbed." 55 F.3d at 879 (citation omitted).

The Third Circuit goes on to recognize that,

[i]n ruling on § 1404(a) motions, courts have not limited their consideration to the
three enumerated factors in § 1404(a) (convenience of parties, convenience of
witnesses, or interests of justice), and, indeed, commentators have called on the
courts to "consider all relevant factors to determine whether on balance the
litigation would more conveniently proceed and the interests of justice be better
served by transfer to a different forum."

*Id.* (citation omitted). The Court then describes some of the "many variants of the private and

public interests protected by the language of § 1404(a)." *Id.*

The private interests have included: plaintiff's forum of preference as manifested
in the original choice; the defendant's preference; whether the claim arose
elsewhere; the convenience of the parties as indicated by their relative physical
and financial condition; the convenience of the witnesses – but only to the extent
that the witnesses may actually be unavailable for trial in one of the fora; and the
location of books and records (similarly limited to the extent that the files could
not be produced in the alternative forum).

The public interests have included: the enforceability of the judgment; practical
considerations that could make the trial easy, expeditious, or inexpensive; the
relative administrative difficulty in the two fora resulting from court congestion;
the local interest in deciding local controversies at home; the public policies of
the fora; and the familiarity of the trial judge with the applicable state law in
diversity cases.

*Id.* (citations omitted).

4

Considering these "jurisdictional guideposts," the court turns to the "difficult issue of federal comity" presented by transfer motions. *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 976 (3d Cir. 1988). USR has not challenged defendants' assertion that venue would also be proper in the Northern District of California. (D.I. 31 at 3) As such, the court does not further address the appropriateness of the proposed transferee forum.[1] *See* 28 U.S.C. § 1404(a).

## 2. Private Interests

### (a) Plaintiff's forum preference

Plaintiffs have historically been accorded the privilege of choosing their preferred venue for pursuing their claims. *See C. R. Bard, Inc. v. AngioDynamics, Inc.*, 156 F. Supp. 3d 540, 545 (D. Del. 2016). "It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice 'should not be lightly disturbed.'" *Shuttle v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (internal citation omitted). However, the Federal Circuit has recognized that "[w]hen a plaintiff brings its charges in a venue that is not its home forum . . . that choice of forum is entitled to less deference, *In re Link_A_Media Devices Corp.*, 662 F.3d 1221, 1223 (Fed. Cir. 2011), and judges within this district have defined a party's "home forum" as its principal place of business, *see Mitel Networks Corp. v. Facebook, Inc.*, 943 F. Supp. 2d 463, 469-70 (D. Del. 2013).

In the present action, USR does not allege that it has facilities, employees, or operations in Delaware. USR's choice of Delaware as a forum weighs in USR's favor, but not as strongly

---

[1] The first step in the transfer analysis is to determine whether the movant has demonstrated that the action could have been brought in the proposed transferee venue in the first instance. *See Mallinckrodt, Inc. v. E-Z-Em, Inc.*, 670 F. Supp. 2d 329, 356 (D. Del. 2009). This issue is not disputed. (D.I. 31 at 3)

5

as it would if USR had a place of business in Delaware. *See IpVenture, Inc. v. Acer, Inc.*, 879 F. Supp. 2d 426, 431 (D. Del. 2012); *see also Symantec Corp. v. Zscaler, Inc.*, C.A. No. 17-806-MAK, D.I. 25 at 3-4 (D. Del. July 31, 2017) (citing *Memory Integrity, LLC v. Intel Corp.*, C.A. No. 13-1804-GMS, 2015 WL 632026, at *3 (D. Del. Feb. 13, 2015) (concluding that a non-practicing entity's choice of forum should receive limited deference because it had no physical presence in Delaware)). Consequently, USR's forum preference weighs slightly against transfer.

### (b) Defendant's forum preference

Defendants' preference to litigate in the Northern District of California, where defendants maintain their principal places of business, weighs in favor of transferring venue. However, defendants' preference is accorded less weight than USR's preference. *See Stephenson v. Game Show Network, LLC*, 933 F. Supp. 2d 674, 678 (D. Del. 2013) (citing *Cradle IP, LLC v. Texas Instruments, Inc.*, 923 F. Supp. 2d 696, 699-700 (D. Del. 2013)).

### (c) Where the claim arose

A claim for patent infringement arises wherever someone has committed acts of infringement. *See generally* 35 U.S.C. § 271(a); *Red Wing Shoe Co., Inc. v. Hockerson–Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998) (an infringement claim "arises out of instances of making, using, or selling the patented invention"). Because defendants' allegedly infringing products are sold and used nationwide, the asserted patent claims may be said to arise in Delaware. *See C. R. Bard, Inc. v. AngioDynamics, Inc.*, 156 F. Supp. 3d 540, 547 (D. Del. 2016) (finding that a patent claim arose in Delaware when the defendant sold products there); *Scientific Telecomm., LLC v. Adtran, Inc.*, C.A. No. 15-647-SLR, 2016 WL 1650760, at *1 (D. Del. Apr. 25, 2016) (holding that, despite ties to Alabama, the defendant operated on a global basis, and its incorporation in Delaware precluded arguments that the forum was

6

inconvenient absent a showing of a unique or unexpected burden). This factor is neutral.

## (d) Convenience of the parties

In evaluating the convenience of the parties, a district court should focus on the parties' relative physical and financial condition. *See C. R. Bard*, 2016 WL 153033, at \*3 (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)). When a party "accept[s] the benefits of incorporation under the laws of the State of Delaware, 'a company should not be successful in arguing that litigation' in Delaware is 'inconvenient,' 'absent some showing of a unique or unexpected burden.'" *Scientific Telecomm., LLC v. Adtran, Inc.*, C.A. No. 15-647-SLR, 2016 WL 1650760, at \*1 (D. Del. Apr. 25, 2016) (quoting *ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 573 (D. Del. 2001)). "Unless the defendant 'is truly regional in character' – that is, it operates essentially exclusively in a region that does not include Delaware – transfer is almost always inappropriate." *Checkpoint*, 797 F. Supp. 2d at 477 (quoting *Praxair, Inc. v. ATMI, Inc.*, 2004 WL 883395, at \*1 (D. Del. Apr. 20, 2004)).

The record before the court reveals that USR is a small company with negative cash flow and no income, funded out of the savings of its founder, Dr. Weiss. (D.I. 36 at ¶ 11) The USR entities collectively have six full-time employees, two part-time employees, and three consultants located in Massachusetts. (*Id.* at ¶ 9) USR's records are kept in six storage boxes in Massachusetts. (*Id.* at ¶ 10) In contrast, there is no dispute that Apple and Visa are large, wealthy corporations who engage in business throughout the United States. (D.I. 38 at 6) Defendants have not shown a unique or unexpected burden as required to support transfer under the relevant standard. *See Cornerstone Therapeutics Inc. v. Exela Pharma Scis., LLC*, C.A. No. 13-1275-GMS, 2014 WL 12597625, at \*1 (D. Del. June 16, 2014) ("[T]he decision of two out of

7

three defendants to incorporate in Delaware casts doubt on their arguments that litigating in this state is inconvenient.").

Defendants point out that USR has no connections to Delaware, yet has accepted the costs of travel to Delaware by choosing to litigate here. (D.I. 22 at 15) (quoting *Blackbird Tech LLC v. TuffStuff Fitness, International, Inc.*, C.A. No. 16-733-GMS, 2017 WL 1536394, at \*5 (D. Del. Apr. 27, 2017) ("The court believes that Blackbird, given its location, structure of its company, and lack of substantial connections in Delaware, would suffer little added inconvenience were this case transferred away from its preferred forum.")). However, the distance between Massachusetts and the Northern District of California is substantially greater than the distance between Massachusetts and Delaware. Focusing on the significant difference in the parties' relative financial positions, as well as USR's proximity to Delaware in comparison to the Northern District of California, the court concludes that the present record does not support transfer of venue.[2] This factor weighs slightly against transfer.

### (e) Location of books and records

The Third Circuit in *Jumara* advised that the location of books and records is only determinative if "the files c[an] not be produced in the alternative forum." 55 F.3d at 879. However, the Federal Circuit has explained that "[i]n patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009). Nevertheless, courts within the District of Delaware

---

[2] The court recognizes that the analysis of this factor typically focuses on the size and financial position of the defendant, as opposed to the plaintiff, given that the defendant does not choose to commence the litigation. Nonetheless, the disparity between the parties' size and financial condition is evident in the instant case, and litigating in the Northern District of California is likely to be more expensive and burdensome for USR.

have repeatedly recognized that technological advances have reduced the weight of this factor. *See, e.g., Intellectual Ventures I LLC, v. Checkpoint Software Techs. Ltd.*, 797 F. Supp. 2d 472, 485 (D. Del. 2011); *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 208 (D. Del. 1998); *Nihon Tsushin Kabushiki Kaisha v. Davidson*, 595 F. Supp. 2d 363, 372 (D. Del. 2009). Today, "virtually all businesses maintain their books and records in electronic format readily available for review and use at any location." *C.R. Bard*, 2016 WL 153033, at *3; *see also Quest Integrity USA, LLC v. Clean Harbors Indus. Servs., Inc.*, 114 F. Supp. 3d 187, 191 (D. Del. 2015).

Defendants designed and developed the allegedly infringing technology in the Northern District of California, and much of the documentary evidence is located there. (D.I. 23 at ¶¶ 7-9) Defendants have not shown that relevant documents cannot be transported to Delaware. *See Cruise Control Techs. LLC v. Chrysler Group LLC*, C.A. No. 12-1755-GMS, 2014 WL 1304820, at *4 (D. Del. Mar. 31, 2014) (concluding that location of books and records is only relevant "where the Defendants show that there are books and records that cannot be transported or transmitted to Delaware."). This factor weighs slightly in favor of transfer.

#### (f) Convenience of the witnesses

The relevant inquiry with respect to convenience of the witnesses is not whether witnesses are inconvenienced by litigation, but rather, whether witnesses "actually may be unavailable for trial in one of the fora." *Jumara*, 55 F.3d at 879. The inconvenience of travel does not demonstrate that witnesses would "actually be unavailable for trial," as required by *Jumara*. 55 F.3d 873, 879 (3d Cir. 1995). The court has previously found that

> travel expenses and inconveniences incurred for that purpose, by a Delaware defendant, [are] not overly burdensome. From a practical standpoint, much of the testimony presented at trial these days is presented via recorded depositions, as opposed to witnesses traveling and appearing live. There certainly is no obstacle to [a party] embracing this routine trial practice.

9

*Oracle Corp. v. epicRealm Licensing, LP*, No. Civ. 06-414-SLR, 2007 WL 901543, at *4 (D. Del. Mar. 26, 2007).

Defendants identify six prior art witnesses who reside in or near the Northern District of California and are named inventors on patent applications. (D.I. 24 at ¶ 13) Defendants do not identify former employees or other third party witnesses. Other third party witnesses involved in the prosecution of the patents-in-suit are located in Massachusetts and have affirmatively expressed their willingness to testify at trial in Delaware, despite residing beyond the subpoena power of both this court and the proposed transferee district. (D.I. 32 at ¶¶ 3-6; D.I. 34 at ¶¶ 3-6) An independent technology consultant to USR residing in Massachusetts also indicated that he will voluntarily travel to Delaware to testify at trial in this matter. (D.I. 33 at ¶¶ 2-5) Because defendants have not identified any specific witnesses who cannot appear in Delaware for trial, this factor is neutral.

## 3. Public interests[3]

### (a) Practical considerations

Defendants reiterate their arguments regarding private interest factors such as the convenience of the parties and witnesses, and the location of evidence, in support of their position on practical considerations. (D.I. 22 at 18) Courts in this district have declined to "double-count" a defendant's arguments in such cases. *Contour IP Holding, LLC v. GoPro, Inc.*, C.A. No. 15-1108-LPS-CJB, 2017 WL 3189005, at *13 (D. Del. July 6, 2017). This factor is neutral.

---

[3] Turning to the *Jumara* factors, the court notes that the parties do not dispute several of the public interest factors: (1) the enforceability of the judgment; (2) the public policies of the fora; and (3) the familiarity of the trial judge with the applicable state law in diversity cases. (D.I. 22 at 17-20; D.I. 31 at 15-19) These factors are therefore neutral.

10

### (b) Court congestion

Defendants allege that this factor weighs in favor of transfer due to the judicial vacancies on this court, citing statistics[4] regarding the number of open patent cases and the rates at which new patent cases are filed in each jurisdiction. (D.I. 22 at 18-19; D.I. 38 at 10) However, "the case management orders [in this district] always start with the schedules proposed by the litigants . . . . [I]f there is a need to expedite proceedings, that need is generally accommodated by the court." *Godo Kaisha IP Bridge 1 v. OmniVision Techs., Inc.*, 246 F. Supp. 3d 1001, 1003-04 (D. Del. 2017). Defendants' reliance on *MEC Resources, LLC v. Apple, Inc.* is inapposite because the court's finding that considerations of court congestion weighed in favor of transfer was based largely on the prospect of avoiding an allocation of Delaware's judicial resources to resolve a dispute between citizens of California and North Dakota. C.A. No. 17-223-MAK, 2017 WL 4102450, at *5 (D. Del. Sept. 15, 2017). In contrast, Visa is a Delaware corporation. This factor is neutral.

### (c) Local interest

The local interest factor is generally neutral in patent litigation because patent cases "implicate[] constitutionally protected property rights, [are] governed by federal law reviewed by a court of appeals of national (as opposed to regional) stature, and affect[] national (if not global) markets." *C.R. Bard, Inc. v. Angiodynamics, Inc.*, 156 F. Supp. 3d 540, 547 (D. Del. 2016) (citing *Cradle IP v. Texas Instruments, Inc.*, 923 F. Supp. 2d 696, 700-01 (D. Del. 2013)); *see*

---

[4] USR counters with statistics of its own, stating that the Northern District of California has 622 pending actions per judge to 515 per judge in this district, and noting that the average time to trial in civil cases is faster in Delaware than it is in the Northern District of California. (D.I. 35, Ex. B)

*also Tessera*, 2017 WL 1065865, at *11. Because USR brings only federal patent law claims, the local interest factor is neutral.

### 4. Transfer analysis summary

As a whole, the *Jumara* factors weigh against transfer. Although USR's forum preference is given slightly less deference because USR does not maintain a place of business in Delaware, it is accorded more weight than defendants' choice of forum. Defendants have shown that most of the relevant evidence and witnesses are located in the Northern District of California, but have not shown that the evidence and witnesses would be unavailable if the case is not transferred. USR has established that it is a small company with limited financial resources in comparison to Apple and Visa, and Delaware is a more convenient forum for it as a party to the action. The remaining factors are neutral. For these reasons, I recommend that the court deny defendants' motion to transfer venue.

## B. Patentability Under § 101

### 1. Legal standard

Defendants move to dismiss the pending action pursuant to Rule 12(b)(6), which permits a party to seek dismissal of a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008). According to defendants, USR's complaint fails to state a claim because the patents-in-suit are ineligible for patent protection under 35 U.S.C. § 101.

Section 101 provides that patentable subject matter extends to four broad categories, including "new and useful process[es], machine[s], manufacture, or composition[s] of matter."

35 U.S.C. § 101; *see also Bilski v. Kappos*, 561 U.S. 593, 601 (2010) ("*Bilski II*"); *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980). The Supreme Court recognizes three exceptions to the statutory subject matter eligibility requirements: "laws of nature, physical phenomena, and abstract ideas." *Bilski II*, 561 U.S. at 601. In this regard, the Supreme Court has held that "[t]he concepts covered by these exceptions are 'part of the storehouse of knowledge of all men . . . free to all men and reserved exclusively to none.'" *Id.* at 602 (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)). At issue in the present case is the third category pertaining to abstract ideas, which "embodies the longstanding rule that an idea of itself is not patentable." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (internal quotations omitted).

In *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), the Supreme Court articulated a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. In accordance with the first step of the *Alice* test, the court must determine whether the claims at issue are directed to a patent-ineligible concept. *See id.* If so, the court must turn to the second step, under which the court must identify an "'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (certain quotation marks omitted). The two steps are "plainly related" and "involve overlapping scrutiny of the content of the claims." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).

At step 1, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network,*

13

*Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) ("The 'abstract idea' step of the inquiry calls upon us to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter."). However, "courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (internal quotation marks omitted). "Whether at step one or step two of the *Alice* test, in determining the patentability of a method, a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps." *Enfish*, 822 F.3d at 1338.

At step 2, the Federal Circuit instructs courts to "look to both the claim as a whole and the individual claim elements to determine whether the claims contain an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *McRO*, 837 F.3d at 1312 (internal brackets and quotation marks omitted). Under the step 2 inquiry, the court must consider whether claim elements "simply recite 'well-understood, routine, conventional activit[ies].'" *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (quoting *Alice*, 134 S. Ct. at 2359). "Simply appending conventional steps, specified at a high level of generality, [is] not enough to supply an inventive concept." *Alice*, 134 S. Ct. at 2357 (internal quotation marks omitted).

The Federal Circuit looks to the claims as well as the specification in performing the "inventive concept" inquiry. *See Affinity Labs of Texas v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) ("[N]either the claim nor the specification reveals any concrete way of

14

employing a customized user interface."). "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art." *Bascom*, 827 F.3d at 1350. In *Bascom*, the Federal Circuit held that "the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself," but nonetheless determined that the patent adequately alleged an ordered combination of these limitations to be patent-eligible under step 2 at the pleading stage. *Id.* at 1349.

The "mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention" under step 2. *Alice*, 134 S. Ct. at 2358. "Given the ubiquity of computers ... wholly generic computer implementation is not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the abstract idea itself." *Id.* (internal citation and quotation marks omitted). For the second step of the *Alice* framework, the machine-or-transformation test may provide a "useful clue," although it is not determinative. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) (citing *Bilski II*, 561 U.S. at 604 and *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012)). A claimed process can be patent-eligible under § 101 consistent with the machine-or-transformation test if it "uses a particular machine or apparatus" and does not "pre-empt[5] uses of the principle that do not also

---

[5] At both steps 1 and 2 of the *Alice* inquiry, the Federal Circuit considers the issue of preemption to determine whether a patent is not directed to a specific invention and instead would monopolize "the basic tools of scientific and technological work," thereby "imped[ing] innovation more than it would tend to promote it" and "thwarting the primary object of the patent laws." *Alice*, 134 S. Ct. at 2354; *see also McRO*, 837 F.3d at 1315 (applying the doctrine of preemption and concluding that a claim was patent-eligible at step 1); *Bascom*, 827 F.3d at 1350 (applying the doctrine of preemption and concluding that a claim was patent-eligible at step 2). "[T]he focus of preemption goes hand-in-hand with the inventive concept requirement." *Jedi Techs., Inc. v. Spark Networks, Inc.*, C.A. No. 16-1055-GMS, 2017 WL 3315279, at \*8 n.2 (D. Del. Aug. 3, 2017) (quoting *Tenon & Groove, LLC v. Plusgrade S.E.C.*, C.A. No. 12-1118-GMS,

use the specified machine or apparatus in the manner claimed." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2010), *aff'd sub nom.*, *Bilski v. Kappos*, 561 U.S. 593 (2010).

Patent eligibility under § 101 is a question of law suitable for resolution on a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016) (applying regional circuit law to the de novo review of a district court's patent eligibility determination under § 101 on a Rule 12(b)(6) motion to dismiss). However, the Federal Circuit recently emphasized that, "like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact[]" that goes beyond what was simply known in the prior art. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). On a motion to dismiss, this question of fact, like all questions of fact, must be resolved in the plaintiff's favor. *Aatrix Software, Inc.*, 882 F.3d at 1128.

## 2. Analysis

As a preliminary matter, the court addresses the parties' disagreement as to whether the claims addressed in the briefs are adequately representative of the remaining 107 asserted claims across the four patents-in-suit. Defendants address one claim from each patent-in-suit described by USR as "exemplary" in the complaint. (D.I. 1 at ¶¶ 43, 65, 84, 106) Defendants contend that USR's use of the word "exemplary" and the fact that "all of the claims effectively cover the same core system with some variations[]" indicate that the chosen claims are representative.

_____

2015 WL 1133213, at *4 (D. Del. Mar. 11, 2015)). However, "the absence of complete preemption does not demonstrate patent eligibility." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015).

16

(12/13/17 Tr. 15:4-8) USR charges defendants with failing to meet their burden to establish how the four claims are representative of the 107 asserted claims which are not discussed, drawing a semantic distinction between "exemplary" and "representative." (D.I. 30 at 20)

While defendants bear the burden of proof to establish the exemplary nature of an asserted claim, USR's representations in the complaint itself support defendants' position that the identified claims are sufficiently representative. At oral argument, USR denied that the claims relied upon by defendants are representative of the remaining 107 claims, but offered no support for its position. (12/13/17 Tr. 56:20-23, 57:6-8) ("Those representations and allegations in our complaint are not meant to take the place of detailed infringement allegations and we submit they do not. . . . Do we think [the example in the complaint is] representative of infringement for every claim of every asserted patent? Absolutely not."). Having considered the parties' positions and the facts before the court, I recommend that the court treat the claims addressed in the briefing as adequately representative of the remaining 107 asserted claims across the patents-in-suit for purposes of the pending motion.

### (a)    '539 patent

#### (i)  *Alice* Step 1

Applying the first step of the *Alice* framework to the asserted claims, the court concludes that exemplary claim 22 of the '539 patent is not directed to an abstract idea because "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017) (quoting *Enfish*, 822 F.3d at 1336). The preamble of claim 22 recites "[a] method for providing information to a provider to enable transactions between the provider and entities who have secure data stored in a secure registry in

which each entity is identified by a time-varying multicharacter code." ('539 patent, col. 20:4-7) Claim 22 subsequently lists the following requirements: (1) receiving a transaction request including a time-varying multicharacter code; (2) mapping the time-varying multicharacter code to the identity of the user; (3) determining compliance with access restrictions to secure data; (4) accessing information of the entity required to perform the transaction based on access restrictions; (5) providing the account identifying information to a third party without providing such information to the provider to enable or deny the transaction; and (6) enabling or denying the provider to perform the transaction without the provider's knowledge of the account identifying information. (*Id.*, col. 20:9-31)

Verifying account information to enable a transaction is a well-known practice, as "determination/verification of a person's identity will typically dictate extension of credit, granting access to information, allowing entry to a restricted area, or the granting of numerous other privileges." ('539 patent, col. 1:46-52) However, the '539 patent is directed to an improvement in computer functionality by enabling anonymous identification, which secures the transaction without giving the merchant identifying information such as a credit card number. ('539 patent, col. 2:17-22, 2:64-3:1) The time-varying multicharacter code claimed in the '539 patent obviates the need for encryption of the identifying data, (*id.*, col. 13:43-51), and the anonymous identification system protects the credit card information from theft or fraud by the merchant, (*id.*, col. 2:17-22; 12:11-18). The '539 patent specification confirms that "conventional identification devices require that at least some personal information be transmitted to complete a transaction." (*Id.*, col. 2:24-27) Consequently, the claims of the '539 patent represent a technological improvement sufficient to distinguish the invention from an unpatentable abstract idea. *See Visual Memory*, 867 F.3d at 1259.

18

#### (ii) *Alice* **Step Two**

Having determined that claim 22 of the '539 patent is not directed to an abstract idea, the court need not proceed to the second step of the *Alice* test to determine whether the patent describes an inventive concept.[6] As previously stated, the '539 patent claims the inventive concept of enabling anonymous identification to secure a transaction without giving the merchant identifying information such as a credit card number. ('539 patent, col. 2:17-22, 2:64-3:1); *see also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (acknowledging significant overlap between step 1 and step 2 of the *Alice* inquiry).

#### (b)    '826 patent

#### (i) *Alice* **Step 1**

Applying the first step of the *Alice* framework, the court concludes that exemplary claim 10 of the '826 patent is not directed to an abstract idea because "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017) (quoting *Enfish*, 822 F.3d at 1336). The preamble of claim 10 recites "[a] computer implemented method of authenticating an identity of a first entity." ('826 patent, col. 45:30-31) Claim 10 subsequently identifies the following requirements: (1) authenticating the user of a first handheld device; (2) retrieving or receiving the user's biometric information; (3) determining a first authentication information from the first biometric information; (4) receiving with a second device the first authentication information; (5)

---

[6] The court has considered the recent supplemental authority from the Federal Circuit which was submitted by USR at D.I. 49 and D.I. 50. However, the Federal Circuit's decisions in both *Aatrix* and *Berkheimer* focused on the district court's analysis under the second step of the *Alice* inquiry, which the court does not reach in the present analysis. *See Aatrix*, 882 F.3d at 1128; *Berkheimer*, 881 F.3d at 1367-68.

retrieving or receiving second authentication information for the user; and (6) authenticating the identity of the user based on both the first and second authentication information. (*Id.*, col. 45:32-47) Like the '539 patent, the '826 patent provides a more secure authentication system. The '826 patent adds requirements pertaining to biometric information and implementation on a handheld mobile device, representing a technological improvement as opposed to an abstract idea.

Although limiting the claimed method to handheld devices is not sufficient, by itself, to avoid categorization as an abstract idea, *Alice* requires the court to consider the claim's elements "both individually and as an ordered combination" to determine whether the nature of the claim is transformed into a patent-eligible application. *Alice*, 134 S. Ct. at 2350; *see also Bascom*, 827 F.3d at 1349 (concluding that claims contained an inventive concept even though the limitations recited generic, non-inventive computer, network, and Internet components). The '826 patent is directed to an improvement in computer functionality, as it requires biometric information to locally authenticate the user as well as a second level of remote user authentication. ('826 patent, col. 32:43-56; col. 34:7-25) While certain elements of claim 10 recite generic steps of authenticating a user based on biometric information, the claim as a whole describes an improved distributed authentication system with increased security. Thus, the facts presently before the court are distinguishable from those before the Northern District of Illinois in *IQS US Inc. v. Calsoft Labs Inc.*, because the '826 patent presents "an unconventional technological solution . . . to a technological problem." 2017 WL 3581162, at \*5 (N.D. Ill. Aug. 18, 2017) (quoting *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016)).

#### (ii) *Alice* **Step Two**

Having determined that claim 10 of the '826 patent is not directed to an abstract idea, the court need not proceed to the second step of the *Alice* test to determine whether the patent describes an inventive concept. As previously stated, the '826 patent claims the inventive concept of a more secure mobile authentication system to resolve security issues specific to remote authentication. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (acknowledging significant overlap between step 1 and step 2 of the *Alice* inquiry).

### (c) '137 patent

#### (i) *Alice* **Step 1**

Applying the first step of the *Alice* framework to the asserted claims, the court concludes that exemplary claim 12 of the '137 patent is not directed to an abstract idea because "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017) (quoting *Enfish*, 822 F.3d at 1336). The preamble of claim 12 recites "[a] system for authenticating a user for enabling a transaction." ('137 patent, col. 46:55-56) Claim 12 subsequently lists the elements of a system comprising: (1) a first device with a biometric sensor; (2) a first processor programmed to authenticate the user of the first device, retrieve or receive the user's biometric information, authenticate the user of the first device based on the biometric, and generate a signal; (3) a first wireless transceiver coupled to the first processor and programmed to wirelessly transmit the signals to a second device; and (4) the first processor is programmed to receive an enablement signal indicating an approved transaction from the second device based on acceptance of the biometric authentication as well as the first and second authentication information to enable the transaction. (*Id.*, col.

46:57-47:14) The claimed system generates a time variant or other type of code which can only be used for a single transaction, preventing the merchant from retaining information that could be fraudulently used in subsequent transactions. (*Id.*, col. 18:14-34) The '137 patent thus provides a more secure mobile transaction authentication system with both local and remote authentication, addressing a problem specific to the security of mobile devices.

Although limiting the claimed system to mobile device transactions is not sufficient, by itself, to avoid categorization as an abstract idea, *Alice* requires the court to consider the claim's elements "both individually and as an ordered combination" to determine whether the nature of the claim is transformed into a patent-eligible application. *Alice*, 134 S. Ct. at 2350; *see also Bascom*, 827 F.3d at 1349 (concluding that claims contained an inventive concept even though the limitations recited generic, non-inventive computer, network, and Internet components). The '137 patent is directed to an improvement in the security of mobile devices by using biometric information to generate a time varying or other type of code that can be used for a single transaction, preventing the merchant from retaining identifying information that could be fraudulently used in subsequent transactions. ('137 patent, col. 18:14-34) While certain elements of claim 12 recite generic computer components, the claim as a whole describes an improved authentication system with increased security. The facts presently before the court are distinguishable from those before the court in *Walker Digital, LLC v. Google, Inc.*, because the '137 patent is not a computerization of a preexisting transaction approval process, but instead teaches the use of a predetermined algorithm at both the user's device and at the USR. 66 F. Supp. 3d 501, 511 (D. Del. 2014).

#### (ii) *Alice* Step Two

Having determined that claim 12 of the '137 patent is not directed to an abstract idea, the court need not proceed to the second step of the *Alice* test to determine whether the patent describes an inventive concept. As previously stated, the '137 patent claims the inventive concept of a more secure mobile authentication system to resolve security issues specific to remote authentication. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (acknowledging significant overlap between step 1 and step 2 of the *Alice* inquiry).

### (d)     '813 patent

#### (i) *Alice* Step 1

Applying the first step of the *Alice* framework to the asserted claims, the court concludes that exemplary claim 1 of the '813 patent is not directed to an abstract idea because "the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017) (quoting *Enfish*, 822 F.3d at 1336). The preamble of claim 1 recites "[a]n electronic ID device configured to allow a user to select any one of a plurality of accounts associated with the user to employ in a financial transaction." ('813 patent, col. 51:65-67) Claim 1 subsequently lists the elements of the device comprising: (1) a biometric sensor; (2) a user interface; (3) a communication interface; and (4) a processor coupled to the biometric sensor. *(Id.*, col. 52:1-23) The claimed invention describes several means of authenticating user information to prevent unauthorized use of the electronic ID device. *(Id.*, col. 45:55-46:67; 50:1-22; 51:7-26) The '813 patent thus provides a series of claim elements operating together in a specific way to provide a more secure mobile transaction authentication system with both local and remote authentication, addressing a problem specific

23

to the security of mobile devices without covering, and preempting, every "way[ ] you can authenticate a mobile device payment transaction[.]" (12/13/17 Tr. 39:8-14); *see McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("Whether at step one or step two of the *Alice* test . . . a court must look to the claims as an ordered combination, without ignoring the requirements of the individual steps. The specific, claimed features of these rules allow for the improvement realized by the invention.").

Although limiting the claimed system to verifying an account holder's identity with code and identifying information before enabling a transaction is not sufficient, by itself, to avoid categorization as an abstract idea, *Alice* requires the court to consider the claim's elements "both individually and as an ordered combination" to determine whether the nature of the claim is transformed into a patent-eligible application. *Alice*, 134 S. Ct. at 2350; *see also Bascom*, 827 F.3d at 1349 (concluding that claims contained an inventive concept even though the limitations recited generic, non-inventive computer, network, and Internet components). The '813 patent is directed to an improvement in the security of mobile devices by using a biometric sensor, a user interface, a communication interface, and a processor working together to generate a time varying or other type of code that can be used for a single transaction, preventing the merchant from retaining identifying information that could be fraudulently used in subsequent transactions. ('813 patent, col. 52:1-29) While certain elements of claim 1 recite generic computer components, the claim as a whole describes an improved authentication system with increased security. The facts presently before the court are distinguishable from those before the Federal Circuit in *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, because the '813 patent claims are tied to a tangible device with a biometric sensor, user interface, processor, and other elements. 758 F.3d 1344, 1350 (Fed. Cir. 2014).

The present case is also distinguishable from the Federal Circuit's recent decisions in *Secured Mail Solutions LLC* and *Smart Systems Innovations, LLC*, which defendants raised at oral argument. (12/13/17 Tr. 43:2-21) The '813 patent claims a series of specific elements operating together in a specific way to provide a tangible device that provides a more secure authentication system. In contrast, the patent claims in *Secured Mail Solutions LLC v. Universal Wilde, Inc.*, which provided a method for generation and mailing of a barcode, were "not limited to any particular technology of generating, printing, or scanning a barcode, of sending a mail object, or of sending the recipient-specific information over a network. Rather, each step of the process is directed to the abstract process of communicating information about a mail object using a personalized marking." 873 F.3d 905, 911 (Fed. Cir. 2017). Similarly, in *Smart Systems Innovations, LLC v. Chicago Transit Authority*, the Federal Circuit concluded that the asserted claims were not "directed to specific rules that improve a technological process, but rather invoke computers in the collection and arrangement of data." 873 F.3d 1364, 1372-73 (Fed. Cir. 2017). Claim 1 of the '813 patent is distinguishable from these abstract ideas because the claimed electronic ID device is limited to a particular technology comprising a biometric sensor, a user interface, a communication interface, and a processor, each of which is narrowly configured to the claimed invention as an improvement to the technology. ('813 patent, col. 51:65-52:29)

According to defendants, four pending patent applications that are continuations of the '813 patent also support their position that the patents-in-suit are invalid under 35 U.S.C. § 101. (D.I. 44 at 1) At oral argument, defendants argued that the non-final rejection of U.S. Application No. 14/071,126 ("the '126 application") for patent ineligibility is significant because its claims have substantial similarities to the claims of the '813 patent. (12/13/17 Tr. 6:9-16)

However, consistent with the representations made by the court during the oral argument, the court does not consider the non-final rejection of the '126 application to be "outcome determinative." (12/13/17 Tr. at 8:13-19)

#### (ii) *Alice* Step Two

Having determined that claim 1 of the '813 patent is not directed to an abstract idea, the court need not proceed to the second step of the *Alice* test to determine whether the patent describes an inventive concept. As previously stated, the '813 patent claims the inventive concept of a more secure mobile authentication system to resolve security issues specific to remote authentication. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (acknowledging significant overlap between step 1 and step 2 of the *Alice* inquiry).

### IV. CONCLUSION

For the foregoing reasons, I recommend that the court deny defendants' motion to transfer (D.I. 21), and deny defendants' motion to dismiss pursuant to Rule 12(b)(6) (D.I. 16).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R.

Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

http://www.ded.uscourts.gov.

Dated: September 19, 2018

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE